566 F.2d 451
 10 ERC 1965, 8 Envtl. L. Rep. 20,050
 APPALACHIAN POWER COMPANY, Baltimore Gas and Electric
Company, Carolina Power & Light Company, Duke Power Company,
Monongahela Power Company, Ohio Power Company, Potomac
Edison Company, Potomac Electric Power Company, South
Carolina Electric & Gas Company, Virginia Electric and Power
Company, West Penn Power Company, Indiana & Michigan
Electric Company, Kentucky Power Company, Boston Edison
Company, Cincinnati Gas & Electric Company, Cleveland
Electric Illuminating Company, Columbia & Southern Ohio
Electric Company, Commonwealth Edison Company, Consolidated
Edison Company of New York, Inc., Dayton Power & Light
Company, the Detroit Edison Company, Florida Power & Light
Company, Houston Lighting & Power Company, Illinois Power
Company, Long Island Lighting Company, Arkansas Power &
Light Company, Mississippi Power & Light Company, Louisiana
Power & Light Company, New Orleans Public Service, Inc.,
Montaup Electric Company, National Rural Electric
Cooperative Association, New England EVSv.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.
 Nos. 76-1474, 76-2057.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 17, 1977.
Decided Nov. 11, 1977.
 
 George C. Freeman, Jr., Richmond, Va. (Henry V. Nickel, Michael B. Barr, Washington, D.C., Hunton & Williams, Richmond, Va., on brief), for petitioners.
 James T. Harrington, Chicago, Ill., for U.S. Steel Corp.
 Thomas A. Larsen, Atty., Environmental Protection Agency, Washington, D.C., Sarah Chasis, New York City, for Natural Resources Defense Council, Inc. (Peter R. Taft, Asst. Atty. Gen., Alfred T. Ghiorzi and Michael P. Carlton, Attys., Dept. of Justice, G. William Frick, Gen. Counsel, Washington, D.C., on brief), for Environmental Protection Agency and the Natural Resources Defense Council, Inc.
 Before HAYNSWORTH, Chief Judge, and WIDENER and HALL, Circuit Judges.
 WIDENER, Circuit Judge:
 
 
 1
 These cases come before us on petitions to review EPA's regulations issued under § 316(b)[1] of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251, § 1326(b).[2] Section 316(b) and the regulations under review are discussed in our companion case decided today, Virginia Electric and Power Co. v. Train, 566 F.2d 446, in which we hold that the court of appeals, and not the district court, has jurisdiction to entertain these petitions under § 509(b)(1)(E) of the Act, 33 U.S.C. § 1369(b)(1)(E). The motion in these cases that we dismiss for want of our own jurisdiction is denied.
 
 
 2
 To recapitulate briefly, § 316(b) provides that standards established pursuant to §§ 301 and 306 of the Act must require cooling water intake structures to reflect the best technology available for minimizing adverse environmental impact. EPA implemented § 316(b) by issuing regulations providing that, in determining the best available technology for cooling water intake structures, "(t)he information contained in the Development Document shall be considered." 20 C.F.R. §§ 402.10-402.12.
 
 
 3
 Petitioners in No. 76-1474 are 58 electric utility companies (the utilities), challenging the validity of the regulations on the ground that, in their promulgation, EPA violated the Administrative Procedure Act, 5 U.S.C. § 552(a) (1).[3] A remand for republication in accordance with proper procedures is sought. Petitioner in No. 76-2057 is United States Steel Corp., which, while joining in the utilities' brief, asserts that § 316(b) and the regulations issued thereunder may not be construed to apply to steel manufacturing facilities, but only to steam-electric generating plants.
 
 
 4
 These questions, as well as the jurisdictional issue addressed in No. 76-2081, are preliminary to our review of the merits of EPA's § 316(b) regulations. Briefing has not yet been had on the merits, and consequently we do not know what other grounds of invalidity will be asserted. Petitioners urge, and EPA accepts, a result that will have us defer review of the substance of the regulations and of the "information" contained in the Development Document until the regulations are actually applied in a discharge permit proceeding under § 402, 33 U.S.C. § 1342. This matter, too, will be addressed below.
 
 
 5
 * By stipulation entered into on January 10, 1977,[4] it is agreed that the "information contained in the Development Document" is intended by EPA to be incorporated by reference into 40 C.F.R. Part 402. It is not EPA's position that a word-for-word incorporation by reference of the Development Document was intended. In either case, it is petitioners' position that the Development Document is not a validly issued part of the regulations, because it has not been published in the Federal Register, nor have the procedural requisites for incorporation by reference been complied with. With this position we agree, and hold that 40 C.F.R. § 402.12 is not enforceable for want of proper publication.
 
 
 6
 The Administrative Procedure Act, 5 U.S.C. § 552(a)(1), provides:
 
 
 7
 "Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register."
 
 
 8
 Our first inquiry is whether the APA requires publication of the challenged regulations. It is provided in 5 U.S.C. § 522(a)(1)(D) that, "(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public
 
 
 9
 (D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency."
 
 
 10
 It is clear that 40 C.F.R. § 402.12 is a "substantive rule (. . .) of general applicability" required to be published in the Federal Register. As we stressed in our accompanying jurisdictional opinion, the § 316(b) regulations impose mandatory obligations upon members of the public and permit issuing authorities, all of whom, as required by the regulation, must now consider the information contained in the Development Document in designing and approving cooling water intake structures. Any agency regulation that so directly affects pre-existing legal rights or obligations, Lewis v. Weinberger, 415 F.Supp. 652 (D.N.Mex.1976), indeed that is "of such a nature that knowledge of it is needed to keep the outside interests informed of the agency's requirements in respect to any subject within its competence," is within the publication requirement. United States v. Hayes, 325 F.2d 307, 309 (4th Cir. 1963). As the substance of a regulation imposing specific obligations upon outside interests in mandatory terms, Piercy v. Tarr, 343 F.Supp. 1120 (N.D.Cal.1972), the information in the Development Document is required to be published in the Federal Register in its entirety, or, in the alternative, to be both reasonably available and incorporated by reference with the approval of the Director of the Federal Register. 5 U.S.C. § 522(a)(1).
 
 
 11
 The Development Document was not itself published in the Federal Register, nor was the "information" contained therein. And it is undisputed that the approval of the Director of the Federal Register was not obtained for a proper incorporation by reference. This omission cannot be disregarded. The regulations of the Office of the Federal Register governing incorporation by reference contain numerous safeguards that must be complied with in order to obtain the director's approval.[5] And the legislative history of the APA indicates Congress' desire to achieve a degree of centralized control over incorporations by reference: "Permission to incorporate material in the Federal Register by reference would have to be granted by the Director of the Federal Register, instead of permitting each agency head to decide what should be published." H.R.Rep.No.1497, 89th Cong., 2d Sess. (1966), 2 U.S.Code Cong. & Admin.News, pp. 2418, 2424.
 
 
 12
 In defense, EPA relies upon the principle, derived from the language of 5 U.S.C. § 552(a)(1), that an unpublished regulation, required to be published, may nevertheless be effective against persons with "actual and timely notice of the terms thereof." In support of its contention that petitioners had actual notice of the information contained in the Development Document, EPA stresses the availability of the document, and the fact that petitioners had actual notice of the document's existence.[6]
 
 
 13
 One difficulty with the agency's position is that there is no indication in the record that the petitioners actually obtained notice of the information contained in the Development Document. But considering that they did, as might be inferred from oral argument, an insurmountable obstacle for EPA is the fact that nowhere does it appear exactly, or even approximately, what the term "information" is intended to comprise. The most that can be said of EPA's position is that it establishes the ability of petitioners to have acquired actual notice of the pertinent information because of the availability of the document in which it is contained.
 
 
 14
 This alone cannot avail the agency. The Administrative Procedure Act sharply distinguishes between the concepts of actual notice and reasonable availability. The former is in a sense a substitute for publication; one who has actual notice of an unpublished regulation is bound by it even though the regulation was required to be published. Rodriquez v. Swank, 318 F.Supp. 289 (D.Ill.1970) (3 judge court), aff'd. 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971). But reasonable availability is not a substitute for publication;[7] it is one of two conjunctive requirements which, if satisfied, will cause material to be deemed published. The other condition is that the material be incorporated by reference with the approval of the Director of the Federal Register. In short, the fact that the document was reasonably available does not suffice to establish that petitioners had actual notice of which materials in the Development Document were intended to be incorporated.
 
 
 15
 Along the same line, and more readily apparent, is the EPA's failure to comply with the regulations of the Office of the Federal Register, 1 C.F.R. Part 51, §§ 51.6 and 51.7.
 
 
 16
 § 51.6(a) requires that the "language incorporating material by reference shall be as precise and complete as possible," while § 51.7(a) provides that "each incorporation by reference shall include an identification and subject description of the matter incorporated, in terms as precise and useful as practicable within the limits of reasonable brevity." The obvious meaning of those two sections is that an incorporation by reference must give one affected enough knowledge so that he may easily and certainly ascertain the conditions by which he is to be bound.
 
 
 17
 The agency has failed to comply with either of the requirements. The language of the incorporation by reference is neither precise, nor complete, nor useful. The final Development Document contains two hundred seventy three pages. Included, for example, as "information" are 8 pages of 55 references in which are included 5 documents at least some of which were (perhaps are) not currently available; whether or not the other 50 references should be considered "in the case by case evaluation of the best available technology," as the 5 lesser available might be, is not disclosed. About the same may be said of the thirty-nine page topical bibliography containing the titles of dozens of publications and references to numerous patents. Further detailing from the Development Document is unnecessary; it is at once apparent that the regulation does not disclose what parts of the Development Document are "information" which "shall be considered" by those seeking and issuing permits to discharge. While we emphasize we do not fault EPA for its point source by point source application, we are of opinion it is going to have to devise a less uncertain method of advising those affected of the conditions by which they are to be bound.
 
 
 18
 The utilities make other objections to the incorporation by reference and present them persuasively, but it is not necessary for us to pass on them here. We do note, however, that we have before cautioned EPA that it must comply with publication requirements of the EPA, and we now repeat the admonition. State of Maryland v. Environmental Protection Agency, 530 F.2d 215 (4th Cir. 1975). Should EPA republish the regulations in question, it should insure applicable statutes and regulations concerning publication are complied with.
 
 
 19
 Because EPA failed to comply with the publication requirements of the Administrative Procedure Act as to incorporation by reference, its § 316(b) regulations are presently ineffective to impose obligations upon, or to adversely affect the petitioners. See Morton v. Ruiz, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); W. G. Cosby Transfer & Storage Co. v. Froehlke, 480 F.2d 498 (4th Cir. 1973); State of Maryland v. Environmental Protection Agency, supra.7a The agency on remand may take further action with respect to the regulations should it be so advised.
 
 II
 
 20
 We next turn to the contention of petitioner United States Steel Corporation that § 316(b) of the FWPCA, and hence the regulations implementing that section, apply only to steam-electric generating plants, not to steel mills. We see no merit in this position. There is nothing on the face of the statute that supports such a restrictive interpretation, nor is any reason offered why Congress would have intended to exclude the steel industry from the apparently all-inclusive statutory language. We do not attach persuasive significance to the remark of a single Congressman, heavily relied upon by United States Steel, that singles out steam-electric generating plants in discussing § 316(b).[8] The statement does not imply that only steam-electric plants were intended to come within the ambit of § 316(b), and can easily be explained by the fact that such steam-electric plants account for 80% of the water withdrawn for cooling purposes by industrial point sources. While this fact may indicate that Congress had steam-electric plants in mind when § 316(b) was enacted, there is nothing to indicate the statute was to apply exclusively to them. The statutory language is not so limited, although it would have been a simple matter to do so.
 
 
 21
 Another obstacle is encountered by United States Steel, to which we give weight, the deference that is ordinarily due the interpretation of a statute by the agency responsible for its day-to-day administration. Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).
 
 
 22
 We therefore, reject United States Steel's interpretation because it is contrary to the plain words of the Act, and finds no persuasive support in the legislative history.
 
 III
 
 23
 Petitioners have argued that the proper time for review of the substantive validity of the § 316(b) regulations by this court is when the issuance of denial of a § 402 permit based upon those regulations is reviewed.[9] EPA, in argument, was willing to accept such a result. Moreover, all parties agreed by stipulation that the proper time for review of the information contained in the Development Document is at the permit issuing stage. We conclude that a proper determination of when the EPA regulations should be reviewed cannot be made on the present state of the record. If the regulations are alleged to be invalid as written, we think they must be reviewed expeditiously under § 509(b) (1)(E), Appalachian Power Co. v. Train,545 F.2d 1351, 1359-60, n. 22 (4th Cir. 1976);[10] if the challenge is simply to the manner in which the regulations may be applied in a permit proceeding, then the proper time for review would be on appeal from the issuance or denial of a permit under § 509(b)(1)(F). Since the merits have not yet been briefed, pending resolution of the threshold controversies decided today, we do not know what the asserted grounds of invalidity will be. We have decided the preliminary issues today and will retain jurisdiction over these cases to hear any objections on the merits should the regulations be properly issued.
 
 
 24
 Section 509(b)(1) of the Act requires applications for review of the administrator's action in approving or promulgating any effluent or other limitation under § 301 or § 306 to be filed within 90 days of such approval or promulgation. Earlier versions of the House and Senate bills imposed 30 day bars. See e. g., H.R.Rep.No.92-911, 92d Cong., 2d Sess. (1972). These provisions demonstrate Congress' determination to achieve prompt judicial review of effluent limitations or other limitations, approved by the Administrator, yet alleged to be invalid as written. See Peabody Coal Co. v. Train, 518 F.2d 940 (6th Cir. 1975). No purpose would be served by requiring prompt applications for review to be filed if substantial delays in obtaining review ensued.
 
 
 25
 If, on the other hand, objections to an EPA regulation actually come down to the manner in which it may be applied in issuing or denying a permit, judicial review in advance of the permit issuing stage would be speculative, and, therefore, premature. E. I. duPont de Nemours & Co. v. Train, 541 F.2d 1018, 1028 (4th Cir. 1976), aff'd in part, rev'd in part, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977); Natural Resources Defense Council v. EPA, 537 F.2d 642, 647 (2d Cir. 1976). In such a case, the policy of obtaining prompt review of § 301 or § 306 limitations alleged to be generally invalid does not apply. The regulation as applied in a particular permit proceeding may be reviewed under § 509(b)(1)(F), which authorizes courts of appeals to review action of the Administrator in issuing or denying a permit. Of course, the 90 day statute of limitations would not begin to run until the permit determination was made. Until we know which of these situations is applicable, we should not decide the issue.[11]
 
 IV
 
 26
 Two other matters deserve brief attention.
 
 
 27
 Petitioners ask, if we find want of proper publication to have made the regulation unenforceable, that we review the merits and then remand. We decline so to do, being of opinion this would be an advisory opinion. U.S.Constitution, Art. III.
 
 
 28
 We also decline to require EPA to publish as a regulation in the Federal Register and the Code of Federal Regulations the stipulation found here in footnote 4. Since we remand the regulation, there is nothing for us to act on.
 
 CONCLUSION
 
 29
 In case No. 76-1474, and that part of case No. 76-2057 in which United States Steel joins the utilities, 40 C.F.R. § 402.12 is remanded to the agency.
 
 
 30
 In that part of case No. 76-2057 in which United States Steel seeks a holding it is not covered by § 316(b) of the statute, 33 U.S.C. § 1326(b), the relief prayed for is denied.
 
 
 31
 We retain jurisdiction in case No. 76-1474 and only that part of case No. 76-2057 in which United States Steel joins the utilities in case No. 76-1474. The cases are removed from the active docket of the court.
 
 
 
 [1]
 The regulations were also issued under the authority of §§ 301, 306, and 501(a)
 
 
 [2]
 Hereafter referred to as the Act, or the FWPCA
 
 
 [3]
 Hereafter referred to as the APA
 
 
 [4]
 The January 10, 1977 stipulation reads in pertinent part as follows:
 "1. That the Administrator construes the regulations of 40 C.F.R. § 402.12 to incorporate by reference as part of the regulations of 40 C.F.R. Chapter I. Subchapter N, Part 402 (41 Fed.Reg. 17387-90; April 26, 1976) the information contained in the Development Document, as defined at 40 C.F.R. § 402.11(f).
 "2. That, under 40 C.F.R. Part 402, the information contained in the Development Document is set forth as general guidance for the NPDES discharge permit issuing authority in determining, on a case-by-case basis, the location, design, capacity and construction of a cooling water intake structure reflecting the best technology available for minimizing adverse environmental impact.
 "3. Therefore, in any proceeding for issuance, denial, modification, or specification of an NPDES permit or any condition thereof, any party thereto may challenge any relevant information contained in the Development Document and the permit issuing authority's proposed application thereof in determining cooling water intake structure requirements for the subject source.
 "4. Therefore, it is neither necessary nor appropriate in the instant proceeding to review the information contained in the Development Document.
 "5. The agreement of U. S. Steel to this stipulation in no way constitutes an admission by U. S. Steel that Section 316(b) applies to the steel companies."
 
 
 [5]
 The regulations of the Office of the Federal Register pertaining to incorporation by reference are found in 1 C.F.R. Part 51. Section 51.2 requires that to be eligible for incorporation by reference, material must conform to the policy expressed in § 51.1, and be in the nature of published data, criteria, standards, specifications, techniques, etc., or other published information reasonably available to those affected. Section 51.6 requires that the language incorporating material by reference be as precise and complete as possible. Section 51.7 requires that each incorporation by reference include an identification and subject description of the matter incorporated, in terms as precise and as useful as practicable within the limits of reasonable brevity. Also, a brief description must be included to inform the user of his potential need to refer to the material incorporated. Finally, section 51.4 states that the approval of the Director for incorporation by reference shall only be granted when the material is eligible, its incorporation will substantially reduce the volume of material published in the Federal Register, the material is sufficiently available to afford fairness and uniformity, and the incorporating document is drafted and submitted for publication in accordance with the applicable regulations
 
 
 [6]
 EPA's factual support for the "actual notice" of petitioners, stated in its brief, follows:
 "While not published and distributed concurrently with the publication of the Section 316(b) regulations, the Development Document was immediately available for inspection and copying, when the regulations were published, in EPA's Office of Public Information, and the Development Document was itself printed, bound, and distributed shortly after the 316(b) regulations were promulgated. Petitioners had actual and timely knowledge of the information in the Development Document."
 As we demonstrated below, the transition from the first to the second quoted sentence is something of a non-sequitur. Availability of a document is not the equivalent of actual notice of which parts of it are expected to be complied with by those affected.
 
 
 [7]
 The publication requirement is further distinguished from the availability of incorporated material by the contrast between subsections (a)(1) and (a)(2) of 5 U.S.C. § 552. Subsection (a)(2) enumerates a different class of agency actions than those required to be published under subsection (a)(1). The class enumerated in (a)(2) need not be published in the Federal Register, but need only be made available for public inspection and copying
 7a The remand by the Supreme Court, in 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977), for consideration of mootness had no effect on the point in the Maryland case for which it is cited.
 
 
 [8]
 The remark, by Representative Clausen, reads, "Section 316(b) requires the location, design, construction and capacity of cooling water intake structures of steam-electric generating plants to reflect the best technology for minimizing any adverse environmental impact."
 
 
 [9]
 Such review is authorized by § 509(b)(1)(F) of the Act, 33 U.S.C. § 1369(b)(1)(F)
 
 
 [10]
 At the end of footnote 22 of Appalachian Power, 545 F.2d at 1360, belong the following sentences, printed as the first full paragraph of page 1359: "Thus, it would appear that, unlike the case in duPont, the administration of these regulations is not a matter of speculation. As such, they are properly the subject of review at this time." The inclusion of those sentences in the body of the Appalachian opinion is an error in the reporter
 
 
 [11]
 A question not presently before us, but which we also have taken into account in declining to delve any further than required into the maze of the jurisdictional aspects of the statute, is that of a permit seeker following application to discharge in a State which has qualified to issue discharge permits under §§ 402(a)(5) and 402(b) of the statute, 33 U.S.C. §§ 1342(a)(5) and 1342(b). While § 509(b)(1)(F), 33 U.S.C. § 1369(b)(1)(F) grants review in the courts of appeals from the act of the EPA Administrator in issuing or denying a permit, at least one court has held it has no jurisdiction on the application of an "interested person" if the act in issuing the permit is taken by a State. Mianas River Preservation Committee v. Administrator, E. P. A., 541 F.2d 899 (2nd Cir. 1976). Quaere: what is the position of the permit seeker with respect to judicial review?